## In re STOEVER.

(District Court, E. D. Pennsylvania. January 23, 1904.)

### No. 466.

1. BANKRUPTCY—CLAIMS OF CREDITORS—PROOF — LIMITATION—UNITED STATES.
   Bankr. Act July 1, 1898, c. 541, § 57, cl. "n," 30 Stat. 561 [U. S. Comp. St. 1901, p. 3444], providing that claims shall not be proved against the bankrupt's estate subsequent to one year after the adjudication, is a statute of limitations, and is not binding on the United States.

2. SAME.
   Bankr. Act July 1, 1898, c. 541, § 64, cl. "b," subd. 5, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448], providing that claims of the United States against the bankrupt shall be entitled to priority of payment, and be paid in full, is in pari materia with Rev. St. §§ 3466, 3467 [U. S. Comp. St. 1901, p. 2314], providing for priority of debts due the United States in cases of insolvency, and requiring every assignee or other person to first pay the debts of the United States, and therefore entitles the United States to priority, whether it prove its debt in the bankruptcy proceedings or not.

3. SAME—CONTRACT WITH UNITED STATES—BANKRUPTCY—EFFECT.
   Where a bankrupt had contracted to furnish paper to the United States, and agreed that, in case of his failure to furnish paper as ordered, he should be liable for the difference between the contract price and the amount the government was compelled to pay therefor, the commence-

ment of bankruptcy proceedings against him did not terminate the contract, nor affect the government's rights under the contract.

**4. SAME.**

Where a bankrupt's contract with the government to furnish paper for the Post Office Department provided that the contract might be annulled by the Postmaster General for any failure of the contractor to perform, and that such termination should not impair any right or claim of the United States to indebtedness, or damages for breach of any of the covenants of the contractor, the fact that on the contractor's becoming a bankrupt the Postmaster General annulled the contract did not preclude the government from recovering damages for breaches subsequent to the bankruptcy.

**5. SAME—NOTICE.**

Where, after a government contractor had become bankrupt, the government elected to terminate the contract for the bankrupt's failure to perform, he was not entitled to notice to make subsequent deliveries of material under the contract, as a condition precedent to the government's right to recover damages for his failure to make such deliveries.

## Certificate from Referee.

James B. Holland and J. Whitaker Thompson, for the United States.

Arthur G. Dickson and Samuel Scoville, Jr., for the trustee.

J. B. McPHERSON, District Judge. The following report of the referee will disclose the nature of the present controversy:

"The original petition in this case was filed February 7, 1900, and adjudication thereon made March 28, 1900.

"On August 18, 1901, a deposition for proof of claim of the United States, in the sum of $7,816.95, for actual damages sustained by reason of the failure of the bankrupt to perform a certain contract with the United States, was filed.

"This contract was made July 24, 1899, by the bankrupt as principal, and the United States Fidelity & Guaranty Company as surety; and, after reciting that certain proposals had been made for supplying the Post Office Department with certain supplies of wrapping paper, designated as items Nos. 112, 112a, and 114, in such quantities and at such times, and from time to time, as the same might be ordered, during the fiscal year beginning July 1, 1899, and ending June 30, 1900, stipulated that the bankrupt should furnish and deliver the same at certain prices per ream, and, in case of failure on his part, he and his surety should become indebted to the United States in the sum of ten thousand dollars, as fixed and settled damages, and not as a penalty to be reduced or diminished, and also that, in case of failure to furnish any of said articles within thirty days after they have been ordered, the right was reserved to the Postmaster General to purchase such articles in open market, and, if a greater price than that specified in the contract be paid for such articles, the total difference between the purchase price and the contract price might be charged to the said bankrupt and his surety, and, further, that the contract might be annulled by the Postmaster General for any failure of performance, in his opinion, but that such termination of the contract should not affect or impair any right or claim of the United States to indebtedness or damages for the breach of any of the covenants.

"On August 11, 1899, an order was given for five hundred reams of item No. 114, which was eventually filled. Subsequently thereto nine orders of various items, aggregating sixteen thousand reams, were given, from September 20 to December 5, 1899; and on January 22, 1900, the Postmaster General, in an order reciting that the bankrupt had failed to furnish said articles, under various orders made upon him since July 1, 1899, he was declared a failing contractor, presumably in pursuance of the last-recited stipulation of the contract. Prior to this time, and after repeated urgent reminders and

demands for the delivery of the articles referred to under the orders stated, application was made to two paper companies. and purchases to supply the deficiency were made from one of them; these purchases continuing until February 8, 1900, as to the sixteen thousand reams, and thereafter until June 4th as to the seventy-one hundred reams, for paper needed by the department after the annulment of the contract. The excess paid over the contract price for the 16,000 reams amounted to $5,741.95, and this, together with $2,075, amount paid in excess of the contract price for the 7,100 reams, makes the amount of the claim of the United States, $7,816.95.

"The trustee has filed exceptions to the allowance of the claim, first, because it was not filed within one year from the adjudication; second, because the trustee is informed and believes that the United States could have had the contract filled in the open market without loss to the United States; third, because the claim is for items ordered subsequent to the filing of the petition on February 7, 1900.

"Section 3466 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 2314] provides that, whenever any person indebted to the United States is insolvent, the debts due to the United States shall be first satisfied, and the priority thereby established shall extend as well to cases wherein a debtor not having sufficient property to pay all his debts makes a voluntary assignment, as to cases in which an act of bankruptcy is committed; and by section 3467 [U. S. Comp. St. 1901, p. 2314], every executor, administrator, or assignee, or other person, who pays any debt due by the person or estate from whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, is made answerable in his own person and estate for the debts so due to the United States, or for so much thereof as may remain due and unpaid.

"Section 3468 [U. S. Comp. St. 1901, p. 2314] gives (upon payment) to any surety on the bond of the insolvent the same right of priority for the recovery and receipt of the moneys out of the estate of the insolvent as is secured to the United States.

"The bankruptcy act of July 1, 1898 (chapter 541, § 64, cl. 'b,' 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448]), provides that the debts to have priority, after payment of costs of preserving the estate, filing fees, costs of administration, and wages, are '(5) debts owing to any person who by the laws of the states or the United States is entitled to priority.' The bankruptcy act of March 2, 1867 (chapter 176, § 28, 14 Stat. 530), provided that after the payment of the fees, costs, and expenses, etc., all debts due to the United States, and all taxes and assessments under the laws thereof, should be entitled to priority, or preference, and to be paid first in full.

"The right of the United States under these sections of the Revised Statutes and the bankruptcy act of 1867 (14 Stat. 517, c. 176), was considered in Lewis v. United States, 92 U. S. 618 [23 L. Ed. 513], in which it was said by Mr. Justice Swayne (page 622 [92 U. S., 23 L. Ed. 513]): 'The United States are in no wise bound by the bankrupt act. The clause above quoted [referring to the right of priority under the act of March 2, 1867] is in pari materia with the several acts giving priority of payment to the United States, and was doubtless put in to recognize and reaffirm the rights which those statutes give, and to exclude the possibility of a different conclusion.'

"By section 57, cl. 'n,' of the bankruptcy act of July 1, 1898 (30 Stat. 561 [U. S. Comp. St. 1901, p. 3444]), it was provided that 'claims shall not be proved against the bankrupt estate subsequent to one year after the adjudication.' While the general principle that statutes of limitation do not bind the sovereign would probably permit the proof of this claim of the United States after the expiration of the year, it is manifest that under the provisions of section 3467 the trustee's liability would continue, and, as he would be entitled to indemnity from the funds in his hands, the first exception of the trustee cannot be sustained.

"As to the second exception, the bankrupt act makes a statement under oath of a claimant, setting forth the claim, the consideration etc., prima facie evidence of the debt. While some of the testimony taken might be inadmissible in a suit against the bankrupt, the measure of damage sustained under the contract, in the absence of any countervailing evidence on the part

of the trustee, is sufficiently proved; and the second exception is therefore not sustained.

"As to the third exception, it appears that the 3,000 reams mentioned therein as having been ordered on February 8, 1900, were in fact ordered December 5, 1899; February 8th being the date of the purchase to supply the said quantity ordered December 5, 1899. As to the other items, however, stated in this exception, aggregating 7,100 reams, as before mentioned, no order appears to have been made upon the bankrupt therefor; the contract having been, as already appears, annulled on January 22, 1900. While the stipulation for such a termination of the contract provides that it shall not affect or impair any right or claim of the United States, this must be restricted, presumably, to claims arising out of failure of performance theretofore made. The contract by the bankrupt was to furnish paper at a certain price, as ordered from time to time within a year. If orders were not given him, it is difficult to understand how he could be liable for failure to furnish that of which he could have no knowledge. Any claim of the United States must be for a breach of the contract, and such breach is not possible after the termination of the contract, and without compliance with the provision thereof requiring orders upon the bankrupt for the quantities and articles agreed to be supplied.

"As to the provision liquidating the damages at ten thousand dollars, it is provided by clause 'j,' § 57, of the act of July 1, 1898 (chapter 541, 30 Stat. 561 [U. S. Comp. St. 1901, p. 3444]), that 'debts owing to the United States as a penalty or forfeiture shall not be allowed except for the amount of the pecuniary loss sustained by the act, transaction or proceeding, out of which the penalty or forfeiture arose, with reasonable and actual costs occasioned thereby and such interest as may have accrued thereon according to law.'

"The third exception, therefore, is in part sustained, and the claim of the United States is allowed in the sum of $5,741.95; and the trustee is ordered to make payment thereof."

Upon the foregoing facts the trustee contends that the government has lost its right to share in the fund for distribution by reason of its failure to prove its claim within the year, while the government contends that its whole claim should have been allowed. I do not think that the position taken by the trustee is sound. It is a long and firmly established rule that the sovereign is not bound by a statute of limitation in which he is not named, and the provision in the bankrupt act requiring a claim to be proved within a year is a plain limitation on the creditor's remedy. Lindsey v. Miller, 6 Pet. 666, 8 L. Ed. 538; Gibson v. Chouteau, 13 Wall. 99, 20 L. Ed. 534; United States v. Herron, 20 Wall. 251, 22 L. Ed. 275; Redfield v. Parks, 132 U. S. 239, 10 Sup. Ct. 83, 33 L. Ed. 327; United States v. Dalles, etc., Co., 140 U. S. 632, 11 Sup. Ct. 988, 35 L. Ed. 560. Neither can there be any doubt that the priority of the United States exists either for part or for the whole of its claim. I understand this to be conceded, but, in any event, the authorities are decisive upon the point. In Lewis v. United States, 92 U. S. 622, 23 L. Ed. 513, it was decided by the Supreme Court that the United States was not bound by the bankrupt act of 1867, and that the clause in the act giving priority to "all debts due to the United States" was "in pari materia with the several acts giving priority of payment to the United States, and was doubtless put in to recognize and reaffirm the rights which those statutes gave, and to exclude the possibility of a different conclusion." It was therefore held that the United States was under no obligation to prove a debt in bankruptcy proceedings, but might pursue whatever other remedy should be at its command against the bankrupt

or against any other person. What was said in Lewis v. United States is, I think, equally true of the act of 1898. Section 64, cl. "b" (5), which gives priority to "debts owing to any person who by the laws of the states or the United States is entitled to priority," is in pari materia with sections 3466 and 3467 of the Revised Statutes, and adds nothing to the rights given by those sections, nor takes anything away. See, also, Re Huddell (D. C.) 47 Fed. 206, and United States v. Barnes (C. C.) 31 Fed. 705. The case of U. S. v. Murphy (C. C.) 15 Fed. 589, seems to be somewhat in conflict with United States v. Barnes—both are decisions in the circuit court on appeal—and I incline to think that it may also be in conflict with the decisions of the Supreme Court; but, whatever its value may be as an authority, it is not now in point. Instead of standing by while the bankrupt's assets were being distributed, as was the case there, the government is here seeking to share in the fund; and there is no possible danger to the present trustee, from which a court might desire to protect him on the ground that he would otherwise be treated harshly and inequitably, for a part of the fund has been set apart to answer this very claim, if it shall appear to be valid.

How much, then, is the United States entitled to recover? There can be no doubt, I think, concerning the validity of the claim for such damage as was caused by the bankrupt's breach of contract before February 7th, when the bankruptcy proceeding began; and, in my opinion, the claim is equally valid for the damage suffered thereafter down to the 30th day of June. The bankruptcy proceeding could not affect the government's right under the contract, and this right was to have the paper at the rates agreed upon, or (upon the bankrupts' default) to buy the paper in the market and charge the difference to the bankrupts. Neither did the annulment of the contract on January 22d by the Postmaster General affect the government's right, for the contract expressly stipulated—

"That this contract may be annulled by the Postmaster General for any failure, in his opinion, of the said Charles M. Stoever to do and perform any of the covenants, agreements, or stipulations herein covenanted, agreed, and stipulated to be done or performed by the said parties of the second part, or in case of a willful attempt by him to impose upon the department articles inferior to those required by this contract; and the said parties of the second part further expressly agree that the termination of said contract as aforesaid, or anything done by the Postmaster General in pursuance of the stipulation, shall not affect or impair any right or claim of the United States to indebtedness or damages for the breach of any of the covenants of the contract by the parties of the second part."

The learned referee was of opinion that this should be confined to damages for such breaches as might precede the annulment, but the language is broad enough to cover any right for the breach of any covenant, and it seems to me that this refers to the future as well as to the past. The referee denied the government's right to damages for breaches after February 7th on the ground that its failure to give notice to the bankrupts after February 7th that certain installments of the paper were desired relieved the bankrupts from liability. But I think this conclusion overlooks two considerations: First, that the bankruptcy had totally disabled the contractors from performing their

agreement, and therefore made notice a useless formality, for it would have been a vain thing to notify them to do what it was notorious that they were wholly unable to do; and, second, that, as the contract had been annulled for cause, the bankrupts were no longer entitled to notice. Even if they had been able and had offered to perform, they would not have been permitted to perform after the contract had been put an end to on the ground of their failure to deliver in due season.

The United States is entitled to recover the whole amount of its claim, and to this extent the exceptions to the report of the referee must be sustained.